IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BLAIR WINFIELD DUNHAM, ) | Case No. CV-09-129-N-BLW |
| ) | |
| Plaintiff, ) | **MEMORANDUM DECISION** |
| ) | **AND ORDER** |
| v. ) | |
| ) | |
| KOOTENAI COUNTY, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## INTRODUCTION

The Court has before it Defendants' Motion for Summary Judgment (Docket

No. 20) and Plaintiff's Motion for Leave to Augment Record (Docket No. 29).

The Court heard oral argument on the motions on January 14, 2010 and now issues

the following decision.

## BACKGROUND

On May 21, 2008, Lisa Whitney contacted animal control Officer Karen

Williams and told her that she recently purchased a horse from Blair Dunham.

Whitney told Officer Williams that she was concerned about the condition of that

horse, as well as other horses in Dunham's possession. (Williams Aff., ¶ 19.)

On May 25, 2008, David Carter also contacted animal control regarding

Dunham. Mr. Carter told Officer Williams that he was concerned about the condition of several horses in Dunham's possession. Mr. Carter stated that the horses were located at 5630 W. Mallory Rd. (Williams Aff., ¶ 23.)

West Mallory Rd. runs east and west, and is located in rural Kooteani County, just east of Rathdrum, Idaho. The location is a 5.03-acre tract of land on the south side of W. Mallory Rd. Jay and Kathy Nelson own the property. (Dunham depo., pp. 92-93).

On May 27, 2008, Officer Williams went to the Nelsons' property to investigate the allegations of animal cruelty. (Williams Aff., ¶ 26.) Officer Williams parked her vehicle in the residential driveway and approached the residence to speak with someone inside. (Williams Aff., ¶ 27.) Officer Williams knocked on the door of the residence, but nobody answered. (Williams Aff., ¶ 28.) Officer Williams testified in her affidavit that at that point she could see horses located near the back of the property, as well as a second driveway that appeared to lead to their location. (Williams Aff., ¶ 27.) Using that driveway, Officer Williams drove her vehicle back to the horses. She testified in her affidavit that when she arrived at the location of the horses, she observed five horses in a round-pen which was approximately twenty feet in diameter. (Williams Aff., ¶ 29.) Inside the pen, she observed a water trough partially full of dirty, debris ridden, stagnant water.

(Id.)  She did not observe any evidence of feed in the pen or on the property. (Id.)

Officer Williams then physically examined each horse in the round-pen. She scored four of the five horses a 2.0 or lower on the Henneke Body Scoring System.  (Williams Aff., ¶¶  31-33.)  Based upon the condition of the horses, and the conditions they were living in, Officer Williams testified in her affidavit that she was concerned for the horses, and that she believed they may be victims of animal abuse and/or animal neglect.  (Williams Aff., ¶ 35.)  Officer Williams then left the property without attempting to contact Dunham because, based upon her apparent prior experience with Dunham, she believed Dunham would remove the horses from the property. (Id.)

Officer Williams contacted Idaho Department of Agriculture Senior Livestock Investigator Amity Larsen.  (Williams Aff., ¶ 36.; Larsen Aff., ¶ 14) Officer Williams asked Investigator Larsen to assist her in further investigating the condition of the horses.  (Williams Aff., ¶ 29; Larsen Aff., ¶ 15.)  On May 29, 2008, Officer Williams and Investigator Larsen went to the property. (Williams Aff., ¶ 37; Larsen Aff., ¶ 15.)  Investigator Larsen testified in her affidavit that she could see the horses inside a fenced, wooded area from W. Mallory Rd. (Larsen Aff., ¶ 15.)  As she pulled into the driveway, she could see additional horses located in a round-pen. (Larsen Aff., ¶ 16.)  She and Officer Williams then turned

down the second driveway and exited their vehicles. (Larsen Aff., ¶ 16.)

Officer Williams testified in her affidavit that at that point two of the horses which were originally inside the round-pen on May 27, 2008 were no longer present. However, she observed two other horses on the property which had not been there on her earlier visit. (Williams Aff., ¶ 37.) She and Investigator Larsen inspected the condition of the horses. (Williams Aff., ¶¶ 38-39; Larsen Aff., ¶ 18.) After inspecting condition of the horses, Officer Williams returned to the round-pen, where she noted that the water level of the trough inside the round-pen had dropped to approximately three inches of dirty, debris ridden, stagnant water, and there was no evidence of any feed available to the horses inside the pen. (Williams Aff., ¶ 40.) Investigator Larsen examined the three horses in the round-pen. She gave two horses a score of 2.0 and one horse a score of 3.0 on the Henneke Body Scoring System. (Larsen Aff., ¶ 19.)

After observing the conditions inside the round-pen, Officer Williams contacted Dunham by telephone, and asked her to come to the property to speak with the officers regarding the condition of the horses. Dunham complied. (Williams Aff., ¶ 41.)

After speaking with Dunham, Officer Williams and Investigator Larsen visited Mary Ann Jennings, who had sold the horses to Dunham. (Williams Aff.,

¶ 42.)  Officer Williams and Investigator Larsen then returned to the Mallory

property. (Williams Aff., ¶ 55; Larsen Aff., ¶ 36.)

The officers determined that the three horses inside the round-pen were not

receiving adequate nutrition and that they needed to be removed from the property

pursuant to I.C. §§  25-3504 and 25-3511.  Officer Williams called Shirley Jones

from Panhandle Equine Rescue, who then removed the three horses from the

property. (Williams Aff., ¶¶  55 & 58; Larsen Aff., ¶ 38.)  Later, it was determined

that Dunham had sold two of those horses, and those horses were given to their

new owners when the Panhandle Equine Rescue Facility considered them healthy.

(Dunham depo., pp. 139-140.)

On June 19, 2008, the Honorable Scott Wayman signed an Order Finding

Probable Cause existed to believe Dunham committed three counts of cruelty to

animals and three counts of permitting animals to go without care. (Mumford Aff.,

¶ 3.)  On the same day, a Criminal Complaint was filed against Dunham charging

her with three counts of cruelty to animals and three counts of permitting animals

to go without care. (Mumford Aff., ¶ 4.)  The three counts of permitting animals to

go without care were later dropped.  (Mumford Aff., ¶ 5.)  Dunham was tried and

found not guilty of the remaining charges. (Mumford Aff., ¶ 6.)  The remaining

unsold horse was returned to Dunham.

Dunham did not reside at 5630 W. Mallory Rd. on May 27 and 29, 2008. However, the Nelsons gave Dunham complete access to their house, and they allowed her to keep her horses on the land. (Nelson Aff., ¶ 5.)

## ANALYSIS

### I.    Summary Judgment Standard of Review

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings.  *Id.*  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is

not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324. However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Statements in a brief,

unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).

## II.     Defendants' Motion for Summary Judgment

Defendants seek summary judgment on all claims in Dunham's Complaint. The Court will address each claim below.

### A.     Unreasonable Search and Seizure Claims

Dunham claims that Defendants violated her Fourth Amendment rights when they searched the property located at 5630 W. Mallory Rd. and seized her horses without a warrant. Defendants argue that the search was constitutional based on the open fields doctrine, and that the seizure was constitutional based on the plain view doctrine.

#### 1.     Search

The United States Supreme Court has framed the question of who has the right to challenge a search as a substantive Fourth Amendment issue of who has a legitimate expectation of privacy in the area searched. *United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 756 (9th Cir. 2009), citing *Rakas v. Illinois*, 439 U.S. 128, 140 (1980); *see also Minnesota v. Carter*, 525 U.S. 83, 88 (1988). The person asserting the right has the burden of demonstrating a legitimate expectation of privacy. *United States v. Zermeno*, 66 F.3d 1058, 1061 (9th Cir. 1995);

*Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S. Ct. 2556 (1980).

The legitimate expectation of privacy inquiry has both a subjective and an objective component. *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979), *citing Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967); *see also United States v. Monghur*, _ F.3d _, 2009 WL 4432567 at *4 (9th Cir. 2009) (rejecting argument that a defendant waived his expectation of privacy where he demonstrated "both an objective and subjective intention to preserve privacy").  With respect to the subjective element, the Court considers whether, through her conduct, the individual "exhibited an actual (subjective) expectation of privacy." *Smith*, 442 U.S. at 740, *quoting Katz*, 389 U.S. at 361, 351.  As for the objective element, the Court determines whether the expectation of privacy is "one that society is prepared to recognize as 'reasonable.'" *Id.* at 740-41, *quoting Katz*, 389 U.S. at 353, 361.

Here, the Court need not address Dunham's subjective expectation of privacy because, pursuant to the open fields doctrine, there is no objective expectation of privacy in the area where the horses were located.  The open fields doctrine permits officers to enter and search a field without a warrant.  *Oliver v. United States*, 466 U.S. 170, 173 (1984).  This interpretation of the Fourth Amendment tracks with the right to privacy found in Fourth Amendment

jurisprudence.  *Id*. At 177.  The rule provides that "an individual may not

legitimately demand privacy for activities conducted out of doors in fields, except

in the area immediately surrounding the home."  *Id*. At 178.  Moreover, "[i]t is not

generally true that fences or 'No Trespassing' signs effectively bar the public from

viewing open fields in rural areas."  *Id*. at 179.  Thus, it is consistently recognized

that an expectation of privacy in an open field is not an expectation which society

recognizes as reasonable.  *Id*.

The law does, however, distinguish open fields from curtilage.  *Id*. At 180.

Curtilage is "the land immediately surrounding and associated with the home."  *Id*.

Unlike open fields, curtilage requires Fourth Amendment protections which attach

to the home.  *Id*.  At common law, curtilage consisted of "the area to which extends

the intimate activity associated with the sanctity of a man's home and the privacies

of life, and therefore has been considered part of home itself for Fourth

Amendment purposes."  *Id*. (Internal quotation and citation omitted).  Courts have

since defined curtilage by reference to factors that "determine whether an

individual reasonably may expect that an area immediately adjacent to the home

will remain private."  *Id*. (Additional citations omitted).

Questions of curtilage are resolved with specific reference to four factors:

(1) the proximity of the area claimed to be curtilage to the home; (2) whether the

subject area is included in an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by passers-by. *United States v. Johnson*, 256 F.3d 895, 901 (9th Cir. 2001) (per curiam) (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987). These factors are not mechanically applied. Instead, they are analytical tools used to determine whether an area should be afforded protection from unconstitutional searches. *Id.*

The standard for determining, in a civil action brought pursuant to 42 U.S.C. §1983, whether an area searched is curtilage or open fields, is uncertain. In the context of a motion to suppress evidence in a criminal case, it appears that most, if not all circuit courts have determined that curtilage questions are factual determinations which must be made by the trial judge. *Johnson*, 256 F.3d at 901 (explaining that it is vital that the district court make findings of fact on curtilage, which the circuit court may review on appeal); *see also Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *United States v. Reilly*, 76 F.3d 1271, 1275 (2d Cir.1996) (Sixth Circuit joins the Third, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits in concluding that curtilage is a factual question). However, the Court was unable to locate any case which unambiguously addressed whether the court or the judge is charged with making that determination in the

context of a civil proceeding. The closest such case may be the Sixth Circuit

decision in *Daughenbaugh v. City of Tiffin. Id.*

In *Daughenbaugh*, the district court granted summary judgment to three

police officers who were defendants in a § 1983 action, finding that their

warrantless search of the plaintiff's unattached garage did not violate the plaintiff's

4th Amendment rights because the garage was not a part of the curtilage

surrounding the plaintiff's house. On appeal, the Sixth Circuit cited to the familiar

standard for reviewing a trial court's grant of summary judgment, indicating that it

would conduct a *de novo* review and construe the evidence, and all reasonable

inferences therefrom, in a light most favorable to the plaintiff. But the court also

observed that both parties contended that the appellate court should treat this like

the review of a trial court's factual findings, and must adopt all of the district

court's findings unless they are clearly erroneous. The Sixth Circuit rejected this

argument, noting that "[b]ecause this is an appeal of a civil case dismissed on

summary judgment, our review of the district court's decision *de novo* is clearly

the appropriate standard."[1]  *Id.*

The court in *Daughenbaugh* then proceeded to analyze the curtilage under

the four *Dunn* factors, and concluded that "[b]ased on the [court's analysis of the

---

[1] Without explanation, the Seventh Circuit has adopted the *Daughenbaugh* standard.  *See Bleavins v. Bartels* 422 F.3d 445, 449 (5th Cir. 2005).

**Memorandum Decision and Order - 12**

*Dunn* factors] and considering the facts in a light most favorable to Daughenbaugh, we conclude that the garage was located within the curtilage of the house." *Supra,* at 601. Thus, it is not clear that the Sixth Circuit truly applied the Rule 56 standard, since there is little indication that it actually viewed the facts in a light most favorable to the plaintiff. Rather, the court's decision reads much more like a review of a lower court's factual findings. And it seems clear that, in conducting its *de novo* review, the appellate court simply substituted its judgment for that of the trial court. In reversing the district court's decision, the Sixth Circuit did not state its conclusion in terms of there being a disputed issue of material fact which must be decided by a jury. Rather, the circuit court simply concluded that "we find that officers Craig, Boyer, and Jarrett conducted an unconstitutional search of Daughenbaugh's backyard and garage." *Supra*, at 602.

So where does this leave us? On the one hand, it would seem that the issue of curtilage is a fact-intensive inquiry that must ultimately be resolved by a jury in a civil case. This much is borne out by cases in which the issue has been submitted to the jury. *See, e.g., Reid v. Hamby*, 124 F.3d 217 (10th Cir. 1997)(unpublished disposition); *Reich v. McMinnicus*, 886 F. Supp. 674 (S.D. Ind. 1993). On the other hand, in a criminal context, that issue is resolved by the court during a suppression hearing. And, even in a civil context, the appellate courts have treated

the issue as though it is left to the court.  However, the Court concludes that under the facts of this case it does not matter.   Even if we assume that the issue of curtilage would be left to the jury, and construe the evidence in a light most favorable to Dunham, the Court concludes, for the reasons set forth below, that no reasonable jury could conclude that the temporary corrals and enclosures were within the curtilage of the Nelson property.

### a.    Proximity

With respect to proximity, there is no fixed distance at which curtilage extends.  *Id*. at 902 (citing *United States v. Depew*, 8 F.3d 1424, 1427 (9th Cir.1993).  Instead, proximity must be addressed on a case-by-case basis.  *Id*. (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)).  The Ninth Circuit has noted that its sister circuits consider the importance of whether the area in question is in a rural, urban, or suburban setting.  *Id*.  The curtilage of rural homes may extend farther than the curtilage of urban and suburban homes.  *Id*.

In this case, the setting is rural.  Dunham testified that the entire 5+ acre property is "out of town," "treed property," with a "[d]irt road."  (Dunham depo., 93:25-94:2).  During her deposition, Dunham also drew a diagram of the property, which includes two driveways, a house, a garden, a shed, a shop and two horse pens. (Dunham depo., 94-95; Mumford Aff., Ex. 11).  Based on that diagram, the

horse pens are separated from the house by both a driveway and either the shed and shop or the garden.  Dunham also testified in her affidavit that the she kept her horses 400 feet from the residence. (Dunahm Aff., ¶ 11).

Although the property is rural in nature, it would be an impossible stretch to suggest that a horse pen, separated from the house by a driveway and a garden or a driveway and shed and a shop, is a private area immediately adjacent to the home. Accordingly, the first *Dunn* factor weighs strongly in favor of a finding that the horses were not held in the curtilage of the home.

### b.    Enclosure

The next factor considers whether the area is included within an enclosure surrounding the home. "'[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception defining curtilage – as the area around the home to which the activity of home life extends – is a familiar one easily understood from our daily experience.'" *Johnson*, 256 F.3d at 902 (quoting Dunn, 480 U.S. at 302).  Fencing is an important factor in determining curtilage. *Id*. (citing Dunn, 480 U.S. at 301 n. 4).  However, in rural areas like the one in this case, thick trees and shrubs may also create natural boundaries which indicate an area to which the activities of home life extend.  *Id*. (citing *Dunn*, 480 U.S. at 302).

Here, a perimeter fence – not a privacy fence – borders the back and sides of

the entire property, but there is no separate fence surrounding the home. (Dunham Aff., ¶ 11). Also noteworthy is the fact that there is no perimeter fence along the front of the property where the main street passes by. Without any type of privacy enclosure surrounding the house and horse pens, including the complete absence of a fence in front of the property, the enclosure factor supports a finding that the horses were not kept in the curtilage of the home.

### c. Use

The third *Dunn* factor considers the nature of the uses to which the area is put. The Ninth Circuit has noted that other circuits addressing this factor have determined "that officers must have objective data about the use of the area prior to entry." *Id*. At 903 (Internal citations omitted).

Here, the subject area is used to contain horses. Based on the photos provided to the Court, this use would be clear to anyone who saw it. Notably, an area used as a horse pasture or horse pen is not the type of use one would consider intimately tied to private home life. Thus, this factor also supports a finding that the horses were not kept in the curtilage of the home.

### d. Visibility

The final factor considers the steps taken by the plaintiff to prevent observation of the area from passers-by. *Id*. The Court should also consider

natural physical boundaries – meaning it is reasonable for a property owner to forego erecting a privacy fence where natural trees and underbrush already create privacy. *Oliver*, 466 U.S. at 180, n. 11.

In this case, Dunham did not take any steps to prevent observation of the horses or the horse pens. Animal Control Officer Williams testified that the horses were visible from the residence. (Williams Aff., ¶ 28). Photographs of the horse pens on the day of the search also show that the horses were clearly visible inside the pens. Dunham also testified that the horses were visible through the tubular panels of the pens. (Dunham depo., 148: 1-10). Trees prevented observation of the horses from some points of view, but not all. Importantly, no attempt was made to keep the horses entirely out of sight. Accordingly, the final factor also supports a finding that the horses were not kept in the curtilage of the home.

### e. Findings Regarding Curtilage

Under the circumstances of this case, and based on the combination of the four curtilage factors, the Court finds that the horses were not located in an area recognized as curtilage, and that no reasonable jury could find otherwise. The area was not so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection. *Johnson*, 256 F.3d at 904 (quoting *Dunn*, 480 U.S. at 301). Accordingly, based on the open fields doctrine,

the Court concludes that Dunham did not have an expectation of privacy in the searched area.

## 2. Seizure

Having concluded that the warrantless search was lawful, the Court must next address whether the warrantless seizure of the horses was lawful. Defendants contend that the seizure was lawful under the plain view exception to the warrant rule. "To fall within the plain view exception, two requirements must be met: the officers must be lawfully searching the area where the evidence is found and the incriminatory nature of the evidence must be immediately apparent" *United States v. Stafford*, 416 F.3d 1068, 1076 (9th Cir.2005) (Internal quotation and citation omitted); *see also United States v. Lemus*, 582 F.3d 958, 964 (9th Cir. 2009); *United States v. Hudson*, 100 F.3d 1409, 1420 (9th Cir. 1996); *United States v. Simpson*, 10 F.3d 645, 647 (9th Cir.1993). Because the Court already concluded that the initial search of the property was lawful under the open fields doctrine, the first element of the plain view exception is satisfied.

The second element is satisfied when an officer has probable cause to associate the property with criminal activity. *Stafford*, 416 F.3d at 1076; *see also Hudson*, 100 F.3d at 1420. "The determination of whether the officers had probable cause to believe that the items seized were illegal, unlawful, or associated

with criminal activity is objective, but we apply it to the 'actual and/or perceived belief of the law enforcement officer as he . . . engages in search and seizure.'" *Id.* (quoting *United States v. Prim*, 698 F.2d 972, 975 (9th Cir.1983)). "This standard does not require the officers to *know* that the item seized is illegal." *Id.* (emphasis in original). The probable cause standard is a flexible, common-sense approach "requiring only that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband . . . or useful evidence of a crime." *Hudson*, 100 F.3d at 1420. (Internal quotations and citations omitted).

Idaho has animal cruelty and animal neglect laws which make it a crime to deprive animals of proper food, water and care. See I.C. §§ 25-3502, 25-3504 and 25-3511. In this case, the evidence presented to the Court, including photos of the horses at the time the officers viewed and removed them from the property, show visible signs of malnutrition, neglect and/or cruelty. (Larsen Aff., ¶¶ 28-35, Exs. 10, 11, 16, 19, 10-15 and 29). Moreover, the officers saw no proper food or water for the horses. (Williams Aff., ¶ 40.) Faced with the condition of the horses, it would have been immediately apparent to an officer in the position of Officer Williams and Inspector Larsen that the horses were associated with criminal activity – to wit, animal cruelty or neglect by their owner. Therefore, the Court

concludes that the second element of the plain view doctrine is met in this case, and the seizure did not violate Dunham's Fourth Amendment rights. Accordingly, the Court will grant Defendants motion for summary judgment on Dunham's search and seizure claims.

### 3. Qualified Immunity

Officer Williams also contends that she is entitled to qualified immunity on the search and seizure claims against her. "Qualified immunity serves to shield government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 971 (9th Cir. 2005) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has set forth the following two-pronged inquiry to resolve all qualified immunity claims:

> First, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers' conduct violated a constitutional right? Second, if so, was that right clearly established? The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case.

*Id*. (internal quotations and citations omitted). Thus, a district court should

"concentrate at the outset on the definition of the constitutional right and . . . determine whether, on the facts alleged, a constitutional violation could be found. . . ." *Id*. at 207. If a constitutional violation can be found, the court then decides whether the violation was the source for clearly established law that was contravened in the circumstances of the case. *Id.*

As explained above, the Court has found that, on the facts alleged, no constitutional violation can be found. Accordingly, Officer Williams is entitled to qualified immunity. However, even if a constitutional violation could be found, Officer Williams would be entitled to qualified immunity because the alleged violation was not clearly established.

At the very least, there is no clearly established law that horse pens, separated from the main residence by a driveway and a garden or a driveway and shed and a shop, are considered private areas immediately adjacent to the home. Thus, although it would be reasonable for an officer in Officer Williams' position to know that she cannot search an area considered curtilage without a warrant, a reasonable officer would not consider the area searched by Officer Williams curtilage. Accordingly, a reasonable officer in the position of Officer Williams would not consider her conduct unlawful.

Likewise, it would not be clear to a reasonable officer that Officer Williams'

conduct was unlawful in seizing the horses.  A reasonable officer who viewed the

horses in the condition they were seen by Officer Williams would have seen visible

signs of malnutrition, neglect and/or cruelty.  Faced with the condition of the

horses, it would have been immediately apparent to a reasonable officer in the

position of Officer Williams that the horses were the victims of animal cruelty or

neglect by their owner.  Therefore, a reasonable officer would not consider Officer

Williams' conduct unlawful in seizing the horses.  Accordingly, Officer Williams

is entitled to qualified immunity on Dunham's Fourth Amendment claims.

### B.    Malicious Prosecution

"A plaintiff may bring an action under 42 U.S.C. § 1983 to redress

violations of his rights, privileges, or immunities secured by the Constitution and

[federal] laws by a person or entity, including a municipality, acting under the

color of state law." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir.

2004) (Internal quotations and citations omitted); see also 42 U.S.C. § 1983.  To

prevail on a § 1983 malicious prosecution claim, a plaintiff "must show that the

defendants prosecuted her with malice and without probable cause, and that they

did so for the purpose of denying her equal protection or another specific

constitutional right."  *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir.

1995).

Here, Defendants contend that Dunham cannot show that she was prosecuted without probable cause. In support of their argument, Defendants provide the Court with the probable cause findings of the magistrate judge. (Mumford Aff., ¶ 3, Ex. 2). That probable cause finding was based on the affidavits and police reports provided to Judge Wayman. (Id.)

In Idaho, courts have defined probable cause as "information that would lead a man of ordinary care and prudence to believe or entertain an honest and strong suspicion that a person is guilty." *Herold v. Idaho State School for the Deaf and Blind*, 732 P.2d 379, 381 (Idaho App.,1987). The determination of probable cause should not be confused with the higher standard required for a conviction. *Id.* Moreover, in Idaho, a magistrate judge's independent finding of probable cause precludes as a matter of law a finding that there was no probable cause in a malicious prosecution action where there had been full disclosure to the judge. *Willis v. Larsen*, 718 P.2d 1256, 1261 (Idaho App.,1986) (citing *Howard v. Felton*, 379 P.2d 414, 418 (Idaho 1963).

In her argument that she was prosecuted without probable cause, Dunham generally references her affidavit and the affidavit of Kathy Nelson, but makes only conclusory arguments that "[b]ased on the affidavits . . . there is substantial evidence that the Defendants lacked probable cause to pursue the action that ended

in [her] acquittal, and that the action was brought maliciously with the intent to harm [her] business interests." (Plaintiff Response Brief, p. 4). She goes on to make the additional statement that "Defendant Williams had a personal animus against [her] and initiated the seizure of the animals and the malicious prosecution out of the desire to harm [her] business interests." (Plaintiff Response Brief, p. 4).

A review of the actual affidavits provides the Court with no evidence contradicting the probable cause finding of the magistrate judge. Although there may be some general testimony that the horses were not properly cared for before Dunham purchased them, this does not weaken the probable cause finding that they were currently being neglected or mistreated by Dunham. Moreover, as was the case in *Freeman*, "the mere fact a prosecution was unsuccessful does not mean it was not supported by probable cause." *Freeman*, 68 F.3d at 1189. Accordingly, Dunham's malicious prosecution claim fails.

### C. Remaining Claims

Defendants have also moved for summary judgment on Plaintiff's claims for du process violations, excessive force, equal protection violations, cruel and unusual punishment, conspiracy to interfere with civil rights, failure to adequately train and supervise officers, and negligent hiring, retention and failure to discipline or take necessary corrective action claims. It is somewhat unclear from the

Complaint whether Plaintiff meant to assert all of these claims. In fact, Plaintiff

wholly failed to respond to the motion for summary judgment as it relates to most

of these claims. Where Plaintiff did respond, her response was brief and ultimately

unpersuasive. Accordingly, the Court will grant the motion as to these remaining

claims and give only a brief description of the reasons for doing so.

### 1.    Due Process Claim

Dunham makes only a blanket accusation in her Complaint that Defendants

violated her due process rights. Accordingly, the Court will deal with the claim in

short order and briefly explain why Dunham's due process claim fails.

The Fourteenth Amendment to the United States Constitution bars states

from depriving any person of life, liberty, or property, without due process of law.

*Nordyke v. King*, 563 F.3d 439, 449 (9th Cir. 2009); U.S. Const. amend. XIV, § 1.

A procedural due process claim has two distinct elements: (1) a deprivation of a

constitutionally protected liberty or property interest, and (2) a denial of adequate

procedural protections." *Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir.

2001).

Dunham contends that Defendants violated her due process rights when they

seized her horses. There appears to be no dispute that Dunham had a property

interest in her horses – at least with respect to the one horse which was not sold to

a third party. Therefore, the due process claim turns on the alleged denial of adequate procedural protections.

The Ninth Circuit has held that an officer's "compliance with the Fourth Amendment when seizing the property for investigatory purposes satisfies pre-deprivation procedural due process as well." *Sanders v. City of San Diego*, 93 F.3d 1423, 1427 (9th Cir. 1996). In *Sanders*, the Ninth Circuit went on to state that it has found no case where compliance with the Fourth Amendment in the context of criminal investigations or proceedings was held not to satisfy due process as well. *Id*. at 1429. As explained above, Dunham's Fourth Amendment rights were not violated in this matter. Accordingly, the Court also finds that Dunham's due process rights were not violated.

### 2.  Excessive Force

"All claims that law enforcement officers have used excessive force – deadly or otherwise – in the course of an arrest must be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005) (en banc). Such analysis requires balancing the nature and quality of the intrusion on the alleged victim's liberty with the countervailing governmental interests at stake to determine whether the use of force was objectively reasonable under the circumstances. *Id*. at 701. The reasonableness

inquiry asks whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them, not simply whether the force was necessary to accomplish a legitimate police objective. *Id.* Typically, relevant factors in the reasonableness inquiry include "(1) the severity of the crime at issue,(2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989).

In this case, Defendants point out that Dunham does not allege any physical force against her or any damage to her property in her Complaint.  Moreover, there is no evidence that Dunham was ever arrested.  Significantly, Dunham wholly fails to respond to Defendant's argument.  Under these circumstances, the Court has no meaningful way of balancing the factors of an excessive force claim.  Dunham's claim is therefore meritless.  Accordingly, the Court will grant Defendants' motion on the excessive force claim.

### 3.  Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d

563, 570 (9th Cir. 1990) (Internal quotation and citation omitted). An individual

may bring a cause of action under the equal protection clause for a "class of one" if

the plaintiff alleges she was "intentionally treated differently from others similarly

situated and that there is no rational basis for the difference in treatment." *Village*

*o/Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (Per Curiam).

In this case, Dunham makes no allegation that she was treated differently

from any other similarly situated individual. Her Complaint provides Defendants

and the Court with no insight into how her equal protection rights were allegedly

violated, other than to make a blanket statement within a paragraph listing several

other claims. (Complaint, ¶ 16). Moreover, Plaintiff makes no attempt to respond

to Defendants' motion for summary judgment on her equal protection claim.

Accordingly, the Court will grant the motion.

### 4.      Cruel and Unusual Punishment

Defendants ask the Court to grant summary judgment against Plaintiff's

cruel and unusual punishment claim. The Eighth Amendment of the United States

Constitution provides that cruel and unusual punishment shall not be inflicted.

U.S. Const. amend. VIII. "To sustain an Eighth Amendment claim, the plaintiff

must prove a denial of the minimal civilized measure of life's necessities,

occurring through deliberate indifference by prison personnel or officers." *Keenan*

*v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996). Both Supreme Court precedent and the underlying purposes of the Eighth Amendment indicate that there must be an intent to punish in order to establish a cause of action. *Robins v. Meecham*, 60 F.3d 1436, 1440 (9th Cir. 1995). The Eighth Amendment protects the interests and safety of all inmates, and restrains governmental overreaching. *Id.*

In this case, Dunham was tried and acquitted of crimes related to animal cruelty. However, Dunham was never arrested or jailed in the matter. In fact, Dunham makes no allegations of any type of punishment in her Complaint except to suggest that her Eighth Amendment rights were violated. Moreover, Plaintiff failed to respond to Defendants request for summary judgment on her Eighth Amendment claim. Accordingly, summary judgment in favor of Defendants is warranted.

### 5.    Conspiracy to Interfere with Civil Rights

In her Complaint, Plaintiff asserts Count II as a conspiracy to interfere with civil rights pursuant to 42 U.S.C. § 1985. Section 1985 includes the following three subsections: (1) preventing officer from performing duties; (2) obstructing justice; intimidating party, witness, or juror; and (3) depriving persons of rights or privileges. Dunham makes no attempt to reference which subsection Defendants allegedly violated, but it seems clear from the Complaint that subsections (1) and

(2) do not apply.

"The elements of a § 1985(3) claim are: (1) the existence of a conspiracy to deprive the plaintiff of the equal protection of the laws; (2) an act in furtherance of the conspiracy and (3) a resulting injury." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1142 (9th Cir. 2000). However, "[a]n indispensable element of a claim under 42 U.S.C. § 1985(3) is some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action. . . . " *Sprewell v. Golden State Warriors*, 266 F.3d 979, 989 (9th Cir. 2001). Dunham made no such allegations in her Complaint, and Dunham wholly failed to respond to Defendants motion or otherwise come forward with evidence supporting her claim. Accordingly, the Court will grant the motion for summary judgment.

> **6. Failure to Adequately Train and Supervise Officers and Negligent Hiring, Retention and Failure to Discipline or Take Necessary Corrective Action**

Dunham asserts Count IV of her Complaint as a claim for failure to adequately train and supervise police officers.  In Count V, she asserts negligent hiring, retention, and failure to discipline or take necessary corrective action.  Once again, Dunham's claims are difficult to interpret and, once again, Dunham wholly fails to respond to Defendants' motion for summary judgment.

To impose liability on a local governmental entity for failing to act to

preserve constitutional rights, a § 1983 plaintiff must satisfy four criteria: (1)the plaintiff possessed a constitutional right of which she was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) the policy is the moving force behind the constitutional violation. *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

Under the well known *Monell* case, the Supreme Court made clear that a municipality may not be held liable under § 1983 solely because it employed a constitutional wrongdoer. *Monell v. Dept. of Social Services*, 463 U.S. 658 (1978). Furthermore, a municipality cannot be held liable under § 1983 where no constitutional violation has occurred. *Sweaney v. Ada County*, 119 F.3d 1385, 1392 (9th Cir. 1997).

Dunham makes no assertion that the municipality had some policy or custom which was the moving force behind the alleged constitutional violations. Without such, Dunham's claim fails. *Nadell v. Las Vegas Metro. Police Dept.*, 268 F.3d 924, 929 (9th Cir. 2001). Likewise, Dunham produced no evidence that a training or supervision policy led to a constitutional violation. Finally, as explained above, no there was no violation of Dunham's constitutional rights in this case. Accordingly, the Court will grant summary judgment in favor of Defendants on all claims contained in Counts IV and V.

**III.    Plaintiff's Motion to Augment the Record**

In her motion to augment the record, Dunham provided the Court with a magistrate judge's order granting a motion to suppress and denying a petition for forfeiture in an unrelated criminal state criminal matter.  The case has no precedential value and no bearing on this matter.  Accordingly, the motion is moot.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (Docket No. 20) shall be, and the same is hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Leave to Augment Record (Docket No. 29) shall be, and the same is hereby DEEMED MOOT.

The Court will enter a separate Judgment as required by Federal Rule of Civil Procedure 58.

DATED:  **February 10, 2010**



Honorable B. Lynn Winmill
Chief U. S. District Judge